WALLING, Administrator, Wage and Hour Division, United States Department of Labor, v. BELIKOFF et al.

District Court, S. D. New York.

Jan. 14, 1944.

See, also, 3 F.R.D. 92.

Douglas Maggs and Irving J. Levy, both of Washington, D. C., and John K. Carroll and Irving Rozen, both of New York City, for Department of Labor.

Max J. Lovell, of New York City, for defendants.

KNOX, District Judge.

In this suit, the Administrator of the Wage and Hour Division of the Department of Labor seeks to enjoin the defendants from committing alleged violations of the provisions of Section 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of June 25, 1938, 29 U.S. C.A. § 215(a) (1, 2, 5).

Defendants are co-partners engaged in the purchase, repair, rehabilitation and sale in interstate and foreign commerce of men's used or so-called "second-hand" clothing, an industry that, under war time conditions, is assuming large proportions. At the time of suit, defendants had about sixty employees who carried on the above-mentioned type of work, and it is said that a considerable number of them were compensated at a rate less than forty cents an hour, the minimum provided by Wage Order, Part 559, effective July 15, 1940, of the Men's and Boys' Clothing Division of the Apparel Industry.

The complaint further avers that some of the employees aforesaid worked for longer periods than forty hours per work week, and were paid wages for such excess periods at rates less than one and one-half times the regular compensation at which they were employed. Defendants' method of keeping its record is also under attack, and they are said to have shipped goods in interstate commerce, since July 15, 1940, that were produced by workmen who were employed in violation of Section 6 and 7 of the Statute, 29 U.S.C.A. §§ 206, 207.

The answer to the complaint, while admitting that defendants repair and rehabilitate men's used clothing, denies that they were engaged in its "alteration, and hence in the production, of men's used clothing for sale and distribution."

The answer concedes that the goods are sold and shipped in interstate commerce, and that the aforesaid Wage Order was duly promulgated by the Administrator. This order, however, is claimed to be inapplicable to defendants' business. Denial is made that defendants have violated any portion of the statute.

The goods handled by defendants consist, for the most part, of previously worn and damaged men's clothing, coats, trousers, vests, overcoats and jackets. Many of them, when received, contain rips, tears, burns and holes. Collars, cuffs and linings are frequently frayed and worn, while buttons are often missing. Many garments are also soiled and dirty. Shortly after the articles come into defendants' place of business, they are sent to a dry cleaning establishment and made sanitary. When

this has been accomplished, they are returned to defendants for the purpose of renovation. They first go to the examining department where female employees of the defendants, equipped with razor blades and scissors, go over them, marking the locations at which repairs are to be made, and prepare patches for holes in linings. These are attached to particular garments by safety pins, or are put in pockets to await the ministrations of a sewing machine operator. The examining girls also cut away injured buttonholes, and sew the frayed edges of cuffs. Worn elbows are prepared for patchings in much the same way that provision is made for the repair of linings. If these latter are seriously impaired, they are completely removed from the garments, and are supplanted by a new yoke of lining running from shoulder to shoulder. This is cut from a large piece of lining material or from a mill end, and is put in a pocket to be inserted later by a machine operator. If the collar of an overcoat is badly worn, an employee will cut a new one from a piece of velvet and sew it on to the coat. Various other steps of a similar nature are taken so that, ultimately, the damaged garment will be both wearable and merchantable. If the preparations needed to bring this about are extensive, as they frequently are, a garment so treated, when it leaves the examining department, will be "open and cut away" so that "it looks like rags."

The garments will then go to a floor that is under the supervision of defendants' foreman and production manager, to be repaired. On this floor, some 20 or 25 employees called "operators" are engaged. It is equipped with about as many power driven sewing machines, four or five felling machines, one button-hole machine, seven button-sewing mechanical devices, and a binding machine. Some of the operators work on cuffs exclusively, and two others do nothing but sew up the edges of sleeves that have been cut away, and in sewing together the edges of button-holes. After these operations, the garments go to a felling machine upon which one layer of cloth will be sewed to another in such manner that the stitches will not be visible upon the outside of the garment.

After being treated upon the felling machine, coats are sent back to the binding machine operators. Such of the garments as have had their linings torn out, or which do not have sleeve linings, are then mended. The operators also bind the outer edges of pockets and armpits. Employees known as "finishers" then take up the process of renovation. This may consist in sewing linings that could not be handled by the felling machine and in taking care of injuries about the arms, and in sewing up moth holes. When the finishers have completed their work, the garments are mechanically pressed so as to flatten seams and cuffs and make the coats more presentable. Missing buttons are sewed on by a special button machine. As a result of this processing, garments that previously "looked like rags" now have the appearance of a "second hand coat."

From what has been said it would appear that consideration should now be given to the question as to whether or not, in carrying on this processing, defendants' employees are engaged in the production and manufacture of men's apparel, and are, in consequence, within the coverage and protection of the Wage Order of July 15, 1940, that is applicable to the Mens and Boys Clothing Division of the Apparel Industry.

Defendants argue that they are not manufacturers, either factually or constructively, and in support of this contention, they rely heavily upon the decisions of the Supreme Court of the United States in Hartranft v. Wiegmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012; Anheuser-Busch Brewing Ass'n v. United States, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336; and American Fruit Growers v. Brogdex Co., 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801.

In the first of these cases, it was held that shells cleaned by acid, and then ground on an emery wheel, and some of them afterwards etched by acid, and all intended to be sold for ornaments, as shells, were not dutiable as "manufactures of shells" under Schedule M of Section 2504 of the Revised Statutes, but were exempt from duty as "shells of every description, not manufactured" under Section 2505.

The court held that the processing to which the shells had been subjected had not transformed them into manufactured articles inasmuch as they had not become a new and different object, having a distinctive name, character or use from that of a shell. In this connection, it was said [121 U.S. 609, 7 S.Ct. 1243]: "The application of labor to an article, either by hand or by mechanism, does not make the

rffortffortffortffortffortffortffortffortffort

article necessarily a manufactured article, within the meaning of that term as used in the tariff laws. Washing and scouring wool does not make the resulting wool a manufacture of wool. Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton."

The case of Anheuser-Busch Brewing Association likewise arose under the tariff law, and it was there held that "To entitle a manufacturer to drawbacks" under the tariff act then in force, "on imported raw material used in the manufacture or production of articles in the United States, there must be some transformation, so that a new and different article emerges having a distinctive name, character and use. The mere subjection of imported articles, such as corks, to a cleaning and coating process to adapt them to a special use does not amount to manufacturing them within the meaning of the statute, and the exporter is not entitled to drawback thereon."

The case of American Fruit Growers v. Brogdex Co. was little more than a reaffirmation of the doctrine of Hartranft and Anheuser-Busch cases.

Defendants also construe the decision in United States v. Armature Rewinding Co., 8 Cir., 124 F.2d 589, as being in their favor. With this point of view, I am not in agreement. In the Armature Rewinding Co. case, the Court held that a corporate taxpayer which purchased and rebuilt second hand automobile generators and armatures, and then sold the rebuilt articles at about one-half of the price of new articles under an exchange basis, receiving used and defective articles for those which had been rebuilt, was a "producer," and liable for excise taxes on sales of articles under the statute taxing the sale of automobile parts by manufacturers or producers thereof. However, the court went on to say that the purpose of a taxing act, the probable intent of Congress, the general statutory scheme of taxation set up, and constructions adopted by the Commissioner of Internal Revenue, and not rejected by Congress, must all be given appropriate effect in determining what meaning is to be accorded a word or phrase in such an act.

What was there said as to the meaning to be attached to a particular word in a given case is peculiarly applicable here. The basic question here involved is whether the business of defendants falls within the Wage Order of July 15, 1940. Obviously, the work above described should be classified as being within the "apparel industry" and this has been defined as "the manufacture of apparel * * * made by the cutting and sewing process." It is intended to include therein all branches of the industry, and in respect to second-hand clothing, the position of the Labor Department administering the regulations of the Fair Labor Standards Act as to such establishments, may be stated to include "goods which are covered by the definitions of a particular industry, and which are repaired for resale, and firms engaged in such businesses are subject to the wage order for the industry." The Wage and Hour Division of the Department of Labor has ruled to this effect in the following instances: Fleming v. Zavelo, February 21, 1941; Adept Mercantile Trading Co., Inc., July 14, 1942; and M. J. Lovell conference, December 7, 1942. I find that the defendant is such a "manufacturer" within the definition.

At the trial defendants' counsel stated that if this question was resolved in favor of the Government, the violation would be conceded. It is, therefore, disposed of as indicated, a conclusion that is completely warranted by the facts as adduced at the trial and by the long usage and sound reason evidenced in other similar cases of second-hand dealers who process goods of every type and description. See cases cited supra.

I have already ruled as to the violations of the defendant in respect to the provisions of Sections 7 and 15(a) (2) wherein an artificial scheme regarding the time and one-half provisions was devised to circumvent the law, and as to the violations of the provisions of Sections 11(c) and 15(a) (5) by reason of the failure on the part of the defendants to keep and maintain proper records as required by the Regulations, Part 516.

Having found, therefore, that the defendants are covered by the Wage Order, and that these violations enumerated have existed and still exist, there is no other course possible except to grant judgment to the plaintiff, and the defendant will be enjoined from violating the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Act.